UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK                    <u>MEMORANDUM AND ORDER</u>
-------------------------------------------------------x
MITCHELL CAMARDA,

                Plaintiff,

      - against -

SNAPPLE DISTRIBUTORS, INC., et al.,

              Defendants.
-------------------------------------------------------x
THIS DOCUMENT APPLIES TO 63
SEPARATE CASES
-------------------------------------------------------x
<u>Brieant, J.</u>

| | |
|---|---|
| 04 Cv. 01273 (CLB) | 05 Cv. 02256 (CLB) |
| 05 Cv. 02633 (CLB) | 05 Cv. 05063 (CLB) |
| 05 Cv. 02634 (CLB) | 05 Cv. 05050 (CLB) |
| 05 Cv. 02641 (CLB) | 05 Cv. 05054 (CLB) |
| 05 Cv. 02644 (CLB) | 05 Cv. 02121 (CLB) |
| 05 Cv. 02636 (CLB) | 05 Cv. 05047 (CLB) |
| 05 Cv. 02639 (CLB) | 05 Cv. 05046 (CLB) |
| 05 Cv. 02638 (CLB) | 05 Cv. 02122 (CLB) |
| 05 Cv. 05044 (CLB) | 05 Cv. 05045 (CLB) |
| 05 Cv. 05056 (CLB) | 05 Cv. 05043 (CLB) |
| 05 Cv. 05053 (CLB) | 05 Cv. 02123 (CLB) |
| 05 Cv. 05066 (CLB) | 05 Cv. 02635 (CLB) |
| 05 Cv. 05058 (CLB) | 05 Cv. 02124 (CLB) |
| 05 Cv. 05057 (CLB) | 05 Cv. 02263 (CLB) |
| 05 Cv. 05093 (CLB) | 05 Cv. 02168 (CLB) |
| 05 Cv. 05088 (CLB) | 05 Cv. 02169 (CLB) |
| 05 Cv. 05048 (CLB) | 05 Cv. 02262 (CLB) |
| 05 Cv. 05087 (CLB) | 05 Cv. 02170 (CLB) |
| 05 Cv. 05091 (CLB) | 05 Cv. 02171 (CLB) |
| 05 Cv. 05092 (CLB) | 05 Cv. 02173 (CLB) |
| 05 Cv. 05049 (CLB) | 05 Cv. 02174 (CLB) |
| 05 Cv. 05061 (CLB) | 05 Cv. 02248 (CLB) |
| 05 Cv. 02106 (CLB) | 05 Cv. 02177 (CLB) |
| 05 Cv. 02108 (CLB) | 05 Cv. 02180 (CLB) |
| 05 Cv. 02114 (CLB) | 05 Cv. 02182 (CLB) |
| 05 Cv. 02112 (CLB) | 05 Cv. 02183 (CLB) |
| 05 Cv. 02115 (CLB) | 05 Cv. 02261 (CLB) |
| 05 Cv. 02117 (CLB) | 05 Cv. 02247 (CLB) |
| 05 Cv. 02119 (CLB) | 05 Cv. 02259 (CLB) |
| 05 Cv. 05290 (CLB) | 05 Cv. 02257 (CLB) |
| 05 Cv. 02250 (CLB) | 05 Cv. 02635 (CLB) |
| 05 Cv. 05065 (CLB) | |

       Before the Court is Defendants' motion for summary judgment on the claims of Plaintiffs

in 63 related cases, each of whom alleges price discrimination under the Robinson-Patman Act

and breach of contract (Doc. No. 166).  The parties have submitted separate memoranda as to the

Robinson-Patman Act claims and the breach of contract claims.

1

Unless otherwise noted, the following facts are presumed true for purposes of this motion only. Plaintiffs are independent Area Route Distributors of Snapple soft drink products in the New York City metropolitan area, who contracted with Snapple Distributors, Inc. ("SDI") (or its predecessor, Mr. Natural, Inc. or Snapple of Long Island), to purchase and resell Snapple products to specific types of retail outlets within a specifically defined geographic territory. Snapple Beverage Corporation ("SBC") is an affiliate of Cadbury Schweppes Americas Beverages ("CSAB"), which sells Snapple brand beverages throughout the United States. SBC typically sells beverage products to master distributors (or "licensed distributors" or "distributors"), which have exclusive territorial distribution rights.

SDI is one such master distributor with exclusive rights to distribute Snapple products in New York City, Long Island, and Westchester County, as well as in 12 "upstate" New York routes, located from Rockland County to Albany County. SDI also distributes to parts of New Jersey. SDI resells the products it purchases from SBC to the Area Route Distributors and directly to other SDI customers. SDI delivers to the upstate customers by use of SDI trucks and SDI employees. *See Poli Aff. (DX-4).* The majority of SDI's sales in New York City, Long Island and Westchester County, however, are made through independent contractors known as Area Route Distributors. There are currently approximately ninety-four Area Route Distributors in the New York City metropolitan area.

Pursuant to the Area Route Distributor Agreements (the "Agreements" or "Contracts"),

Plaintiffs finance the purchase of their route, delivery truck or trucks and related equipment, and maintain the truck(s) and equipment.[1]  Each Plaintiff is granted exclusive rights to sell Snapple products to designated types of retail outlets within his or her area route ("territory").  The Agreements provide:

> During the term of this Agreement (and subject to the terms and conditions thereof), the Company grants to Route Distributor, the exclusive right, subject to the terms of this agreement, to market, sell and distribute the Products to retail outlets in the Territory which purchase the Products for resale to consumers; including but not limited to "Mom and Pop" accounts, "Pizzeria" accounts, "Restaurant" accounts, "Newstand" accounts, and such provided, however, that except as provided [below], the Route Distributor shall in no event, directly or indirectly, market, sell, or distribute Products to (I) chain stores (including supermarkets), "cash and carry" operations (e.g. Jetro, Inc.), institutional accounts, Beer Class C License accounts, home distributor ("home D") accounts, vending machine operators, or any account deemed to be a national account in conformity with the provisions of this paragraph.

*DX-6, ¶1.*

The Agreements impose several additional limitations and requirements on the Distributors, such as restricting their distribution work to include only Snapple products and requiring that each Distributor's account be increased by 10% each year.  The typical Plaintiff owns or leases one or two trucks and employs one or two employees. *Poli Aff. ¶7.*  Plaintiffs usually maintain separate contracts with the customer retail outlets in their own territory and typically carry between 100 and 400 accounts that they service on a regular basis, and to which they sell primarily 16 ounce loose 24-bottle cases and 16 ounce 12-packs of Snapple products.

---

[1] The Agreements are all with SDI directly or with SDI as a successor in interest to Mr. Natural or Snapple of Long Island.  Although they differ in some small respects, unless otherwise noted, the relevant contract language, and its import are the same for purposes of this case with
respect to all Plaintiffs.

As part of the Agreements, SDI or its predecessor reserved the exclusive right to sell directly or indirectly to chain retail outlets, such as grocery stores that exist within an Area Route Distributor's territory, but also provided that SDI may direct Route Distributors to sell or service accounts that are otherwise reserved to SDI, such as supermarkets or other key accounts.  *See Id. at ¶3.6.*  Based on the language of the contracts, it cannot reasonably be disputed that Plaintiffs' territories are "exclusive" to them only insofar as they involve retail outlets, and that the distribution rights are "subject to" the other terms and conditions, such as those just noted.  *See e.g., McGuckin v. Snapple Distributors, Inc.*, *et al.*, No. 17920/3 (N.Y. Sup. Ct. April 12, 2006), slip op. at 4-5 (*DX-8*)(holding that the contract language as a whole plainly manifests the intention that defendants have the ability to control which accounts plaintiff may serve and does not preclude SDI from electing to serve any of the accounts directly).  SDI generally refers to retail accounts other than supermarkets and chain stores as "All Other Market" accounts ("AOM").

SDI establishes a suggested selling price, a distributor cost and a distributor margin for the Area Route Distributors.  The distributor cost is the "front-line" price paid by the Area Route Distributors to SDI.  Area Route Distributors may sell at prices above the suggested selling price, and retain the additional profit, and sometimes through various promotions, SDI will fund sales temporarily below the suggested price to a particular customer, by funding the difference between the prices so that the Area Route Distributor receives the same margin on its sales to that customer.  *Poli Aff. ¶*11. In so doing, SDI absorbs any costs of the promotion, and Plaintiffs receive the same profit margin for selling products at promotion prices as they would at front-

line prices. *Id. ¶10; Caputo Dep. at 50-51.*  The profit margins of master distributors are similarly protected by SDI or SBC, which will cover the costs of various promotions. *Id.*

As earlier noted, Plaintiffs' Amended Complaints are essentially identical, with the exception of the names of Plaintiffs and the transshippers named in Paragraph 22 or 23 of each Plaintiff's Complaint.  The Complaints allege that from at least 1999, Defendants breached the Area Route Distributors' contracts and that from at least 2001, Defendants violated the Robinson-Patman Act by entering into relationships with transshippers, who purchased Snapple products at a lower price per case and then resold the products within the Plaintiffs' exclusive routes.  Plaintiffs claim that Snapple permitted the transshippers to sell Snapple products in any territory or location without restriction and at any price per case.  They contend that in addition to selling products to transshippers at a lower price, Snapple also gave transshippers preferential financial treatment by not requiring that they comply with the same restrictions placed on the Area Route Distributors, and that for all these reasons, transshippers have been able to sell Snapple products at cheaper prices, and have done so within Plaintiffs' territories.

For purposes of this case, "transshipping" refers to the sale of Snapple products within each of Plaintiffs' respective territories by someone other than the Plaintiff Area Route Distributor.  Transshipped products may be purchased by retailers, among other reasons, because the product may be offered at a lower price than by Area Route Distributors, or because the "transshippers" may deliver additional brands and thereby offer "one-stop shopping," as opposed to Plaintiffs, who are restricted by their contracts to the distribution of only Snapple products.

*See, e.g., New York v. Anheuser-Busch, Inc.*, 811 F. Supp. 848, 853 n.9 (E.D.N.Y. 1993); *see also McLaughlin Report* (Ex. 10).

Plaintiffs claim that Defendants' alleged sales to transshippers (or to those who sold to transshippers) violated the Robinson-Patman Act, 15 U.S.C. § 13(a), because the sales were "in the range of $2.00 to $3.00 per case" less than Plaintiffs paid SDI for the products. Through their expert, Plaintiffs suggest that "rather than enforc[ing] its own transshipping policy, Snapple Beverage Group embarked on a price war with SDI." *PX-3, Expert Report at 5.*

Plaintiffs assert that the transshippers are competitors of Plaintiffs and that lower prices and other preferential treatment given to transshippers has resulted in a lessening of competition, attempts to create a monopoly in the line of commerce, as well as the injury, destruction and prevention of competition between Distributors, transshippers, and their respective customers. Plaintiffs argue that Snapple's relationships with transshippers were unlawful and in direct contravention of the language, spirit and intent of the Area Route Distributors' exclusive agreements. Plaintiffs allege that they have been, and will continue to be harmed by the daily lost sales to potential customers within their territories and the current lost market value of their distributorships and exclusive routes. Plaintiffs aver that they have repeatedly complained to the Snapple Defendants that the transshippers were selling Snapple products within their exclusive area routes and that Snapple has taken no substantive action to stop the conduct, despite Snapple's knowledge of the existence of transshipping and its written policy against transshipping. They argue that Defendants had full and complete knowledge and documentation

6

of the transshipping, including names and locations of transshippers, the original purchasers of the products, the relevant prices, the disruption of territorial integrity and the harmful financial effect of transshipping. Plaintiffs have presented written reports or complaints from Plaintiffs and SDI employees, which show that Snapple products other than those distributed by Plaintiffs were being found and sold in Plaintiffs' territories. *See Oppo. at 5; PX-E.*

Defendants argue that Plaintiffs have no evidence that any Defendant sold Snapple products to the majority of transshippers in this case and that it therefore could not be proved that they "discriminated in price" by selling products to a favored purchaser, and that the few alleged transshippers who purchased Snapple products through SDI's distribution system did so "almost invariably" at a rate *higher* than SDI's net prices for Plaintiffs.[2] Defendants also argue that Plaintiffs cannot establish the separate element of "actual injury" because no Plaintiff has evidence that alleged price discrimination as opposed to other factors (such as the independent acts of third parties) caused his alleged injuries. As to this required element, as would be expected, the Parties' expert reports are in conflict.

*Discussion*

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file,

---

[2] Of the alleged transshippers named in the Complaints of all Plaintiffs, SDI concedes to selling to East Coast Distributors and Jetro Cash & Carry. Plaintiffs do not meaningfully challenge the lack of evidence as to sales to the other named alleged transshippers listed in DX-20, except to assert that one or more Defendants also sold to Beverages Unlimited. Also, as discussed *infra*, Plaintiffs also now argue that Cott Essex was a transshippers, although it was not named as such in any Plaintiff's complaint.

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In evaluating the record to determine whether there is a genuine issue as to any material fact, "the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).  "[T]he judge must ask himself ... whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.

Pursuant to the Clayton Act, as amended by Section 2(a) of the Robinson-Patman Act, the United States Code provides, in relevant part:

> (a) Price; selection of customers. It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them...

15 U.S.C. § 13(a).  Our Court of Appeals has explained:

> Although the Robinson-Patman Act has frequently been the subject of enforcement actions by the Federal Trade Commission, *see, e.g., FTC v. Henry Broch & Co.*, 363 U.S. 166, 168-69, 4 L. Ed. 2d 1124, 80 S. Ct. 1158 (1960); *Biddle Purchasing Co. v. FTC*, 96 F.2d 687, 690-92, 26 F.T.C. 1511 (2d Cir. 1938), it does not itself provide a private right of action for treble damages. Such a right is granted only by § 4 of the Clayton Act, 15 U.S.C. § 15(a), which authorizes private suits by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." *Schwimmer v. Sony Corp. of Am.*, 637 F.2d 41, 46 (2d Cir. 1980) (holding that standing to raise a claim

under § 2(a) of Robinson-Patman Act "is derived from Section 4 of the Clayton Act.

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc*., 369 F.3d

212, 218 (2d Cir. 2004).  Pursuant to Section 4 of the Clayton Act, the United States Code

provides:

> Except as provided in subsection (b), any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a).

## I.  Robinson Patman Act Claims: *Secondary-Line Price Discrimination*

> In order to establish secondary-line price discrimination under section 2(a), a plaintiff has the burden of establishing four facts: (1) that seller's sales were made in interstate commerce; (2) that the seller discriminated in price as between the two purchasers; (3) that the product or commodity sold to the competing purchasers was of the same grade and quality; and (4) that the price discrimination had a prohibited effect on competition.

*George Haug Co. v. Rolls Royce Motor Cars*, 148 F.3d 136, 141 (2d Cir. 1998).  Of these

statutory elements, the second and fourth are in dispute.  A defendant may not be held liable for

secondary-line price discrimination under the Robinson-Patman Act "in the absence of a

showing that the [defendant] discriminated between dealers competing to resell its product to the

same retail customer." *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 175

(U.S. 2006).  "Once the existence of a competitive relationship has been established, the plaintiff

must demonstrate a reasonable possibility that competition has been harmed as a result of the

price differential." *George Haug Co.*, 148 F.3d at 142.[3]

---

[3] Plaintiffs' inexplicably seem to argue that *Haug* does not require them to demonstrate "a reasonable possibility that competition has been harmed" because "competitive injury may be

*A.  Discrimination in Price between Competitors & Cott Essex as Competitor*

Defendants argue that Plaintiffs have no evidence that any Defendant sold Snapple

products to the majority of transshippers in this case, and that it therefore could not be proved

that they "discriminated in price" by selling products to a favored purchaser.  This is not, by

itself, a winning argument, because evidence of illegally discriminatory sales to even one

competitor for resales to the same retail customer, if proved, could be sufficient to prove a

violation.  *See FTC v. Morton Salt Co.*, 334 U.S. 37, 45 (U.S. 1948)("We think that the language

of the Act, and the legislative history [], show that Congress meant by using the words

"discrimination in price" in § 2 that in a case involving competitive injury between a seller's

customers the Commission need only prove that a seller had charged one purchaser a higher

price for like goods than he had charged one or more of the purchaser's competitors.").  Our

Court of Appeals has explained:

> In *FTC v. Morton Salt Co.*, 334 U.S. 37, 49, 92 L. Ed. 1196, 68 S. Ct. 822 (1948), a
> secondary-line price discrimination case, the Supreme Court determined that the
> Robinson-Patman Act was "especially concerned with protecting small businesses" and
> that therefore section 2(a) "was intended to justify a finding of injury to competition by a
> showing of 'injury to the competitor victimized by the discrimination.'"(quoting S. Rep.
> No. 1502, 74th Cong., 2d Sess 4).  Accordingly, the Court held that competitive injury
> may be inferred from evidence demonstrating injury to an individual competitor. 334
> U.S. at 46-47. More specifically, *Morton Salt* permits an inference of injury to
> competition from evidence of a substantial price difference over time, because such a
> price difference may harm the competitive opportunities of purchasers, and thus create a
> "reasonable possibility" that competition itself may be harmed.
>
> That competitive injury may be satisfied in this manner appears at odds with other
> statements made by the Supreme Court whereby the Court has indicated that
> interpretations of the Robinson-Patman Act should be reconciled with other antitrust

---

inferred from evidence demonstrating injury to an individual competitor." *Oppos. at 33-34,
quoting George Haug Co.,* 148 F.3d at 140, 142.

laws. *See, e.g., Great Atlantic & Pacific Tea Co., Inc. v. Federal Trade Commission*, 440 U.S. 69, 80 n.13, 59 L. Ed. 2d 153, 99 S. Ct. 925 (1979) (Interpretations of the Robinson-Patman Act "should be construed consistently with broader policies of the antitrust laws."). Nevertheless, the Supreme Court has repeatedly upheld the *Morton Salt* inference.

*George Haug Co.*, 148 F.3d at 142.


Based on the foregoing authorities, this Court first addresses whether Plaintiffs have shown that genuine issues of material fact exist as to whether there existed discrimination between competitors, and whether there was a substantial price difference over time, which creates a reasonable possibility of injury to competition.


Defendants argue that, as earlier noted, Plaintiffs changed their theory as discovery proceeded, and now argue, although they did not specifically allege in their Complaints, that Defendants sold Snapple products to Cott Essex Distributors ("Cott Essex") at relevant times, a "master distributor" of Snapple products in New Jersey, at a preferential price, and that either Cott Essex or its customers transshipped into Plaintiffs' territories. The Court perceives no prejudice imposed on Defendants by the Court's consideration of Cott Essex as a transshipper, and the pleadings are deemed to conform to the proofs insofar as Plaintiffs allege that Cott Essex was a transshipper through which the alleged violations occurred. In their opposition papers, Plaintiffs claim that Snapple products "sold to SDI and Cott Essex, have been found in the possession of numerous transshippers, including Two B's [2B's]." *Oppos. at 4.* They claim that master distributor Cott Essex received a significantly cheaper price than Plaintiffs from 1999 to 2006, and was given an additional $1.00 discount on 2 million cases of Snapple products in 2002

and 2003.  They assert that Cott Essex Distributors, a former Snapple Distributor with an exclusive route in New Jersey, was prohibited from selling Snapple in New York, but that investigations show that Snapple products sold to transshippers were traced to SDI and Cott Essex.  Plaintiffs claim that sales even through Area Route Distributors can violate the Robinson- Patman Act.

It is undisputed that transshipping fines were levied by Snapple against SDI and Cott Essex and Defendants point out that Cott Essex was also paid for alleged transshipping by others that apparently affected its own territory.  The parties dispute the import of the transshipping fines levied against SDI and Cott Essex.

Snapple Beverage Corporation sells to SDI at a particular price and SDI sells to Area Route Distributors at a higher price.  While Plaintiffs agreed by contract to take on certain business expenses as independent contractors, Defendants reasonably argue that master distributors must provide marketing, warehousing and other general and administrative services, incurring expenses not similarly incurred by Area Route Distributors.  As a master distributor, Cott Essex paid prices similar to SDI..  In light of the rather substantial functional differences of position within the distribution system, it cannot be fairly and reasonably concluded that the price differences between master distributors and Area Route Distributors are discriminatory.  *See, e.g., Hygrade Milk & Cream Co. v. Tropicana Prods.*, 1996 U.S. Dist. LEXIS 6598 n.9 (S.D.N.Y. 1996)(Schiendlin, J.)("While the holding of *Best Brands* is no longer controlling, it does support the proposition that competitive injury is much less likely to occur as a result of

price discrimination between retailers and wholesalers because they generally compete in different markets," citing *Hasbrouck*, 496 U.S. at 580 (Scalia, J., concurring in the judgment)).

Plaintiffs argue that they must prove in "relevant part" that "the same product was sold, and that one purchaser was favored over another customer." *Oppo. Memo at 62.*  Plaintiffs fail to recognize that for purposes of their claims, a favored purchaser must be one that is in competition for the same customers as the disfavored purchaser.  *See Volvo Trucks, supra* (a defendant may not be held liable for secondary-line price discrimination under the Robinson-Patman Act "in the absence of a showing that the [defendant] discriminated between dealers competing to resell its product to the same retail customer.")  In this case, Plaintiffs have specific assigned categories of customers, which may be augmented at SDI's discretion, but this is the contractual agreement to which Plaintiffs' have assented, and the operational expenses incurred willingly by Plaintiffs as part of that contractual agreement do not render other categories of purchasers preferred.  As this Court has explained:

> The fact that a purchaser may incur expenses not incurred by a competitor may increase the purchaser's costs, or reduce their profits, but it does not change the net price paid by either the purchaser or the competitor to the seller. Nor is plaintiffs' claim sustainable under any theory of "indirect" price discrimination. As the Court noted in Amsterdam Tobacco, "it is well established that the forms of 'indirect' price discrimination encompassed by the Robinson-Patman Act are limited to rebates, discounts, free goods, promotional payments, or similar forms of compensation that are given by the seller to the buyer and that, effectively, lower the price charged by the seller to the buyer (in comparison to other buyers)."

*United Magazine Co. v. Murdoch Magazines Distrib.*, 393 F. Supp. 2d 199, 208 (S.D.N.Y. 2005)(Castel, J.)

Plaintiffs' newfound reliance on lower prices paid by Cott Essex does not save their claims against Defendants.  Cott Essex and SDI operate warehouses and operate at a different functional level within the distribution system.  Through their expert, Defendants argue, and this Court agrees, that master distributors such as Cott Essex and SDI hold a different position in the beverage distribution business than do the Area Route Distributors, who by contractual agreement service very specifically delineated types of retail customers, to the specific exclusion of others, notably chain stores and institutional accounts.

Plaintiffs also contend in opposition to the motion that a direct seller-purchaser relationship is not required in a secondary price line discrimination case.  Nevertheless, they do not rebut Defendants' assertion and argument that there is no evidence proffered as to 51 out of 54 named alleged transshippers.[4]  For these reasons, the Court concludes that Plaintiffs have not shown that the price differentials alleged were discriminatory.  The Court also agrees with Defendants that the prices on which Plaintiffs rely do not reflect their net price, and they do not reflect "the net price received" by SDI or SBC, as articulated in *Amsterdam Tobacco*, 107 F. Supp. 2d 210, 220.

*Injury to Competition and Actual Injury*

For related reasons, the Court concludes that Plaintiffs also cannot prove injury to

---

[4] Plaintiffs claim that Beverages Unlimited, 2B's and Harold Levinson Assoc., purchased directly or indirectly through Area Route Distributors. *Oppos. at 34.*  As to the other 51 named transshippers, Plaintiffs incorrectly assert that they needn't show sales to any particular transshipper and that all "that is required to meet the 'injury to competition' element is proof that the seller discriminated in price as between the two purchasers." *Oppos. at 37.*

14

competition, because prices to the alleged transshippers were regularly, if not primarily, higher than prices to Plaintiffs, and to the extent that Cott Essex at times paid lower prices than Plaintiffs, and may have sold Snapple products to a few of the named transshippers, Plaintiffs have not shown that master distributor Cott Essex was a competitor of the Plaintiff Area Route Distributors, such that its price differential can be deemed discriminatory.

Plaintiffs also argue that Defendants' own documents show that Cott Essex was repeatedly fined as a transshipper for product found in Plaintiffs' territories and that "[c]learly, if Snapple['s] own investigators found that Cott Essex's product was found in Plaintiffs' territories [then] Plaintiffs and Cott Essex were in competition." *Oppo. Memo at 55.*  The Court disagrees. There are any number of reasons why a product originating properly from the Cott Essex warehouse could improperly show up for retail sale within the territory of a Plaintiff who did not distribute it.  That this is so does not render Cott Essex in actual competition with Plaintiffs who contract with SDI, another master distributor.  Competitive injury cannot be fairly ascertained by comparisons of a master distributor with the Area Route Distributors, which the Court concludes have not been shown to be competitors for the same customers for purposes of the Robinson-Patman Act, such that genuine issues of material fact would exist as to competitive injury.

Transshipping may be to some extent inevitable in a competitive market, and the Court acknowledges that it could or would at least theoretically infringe upon the sales and profits of authorized distributors.  It is without question difficult to eliminate the problem of transshipping in a metropolitan area such as New York, and the Court acknowledges that beverages such as

these may well pass through several proper or improper tiers of distribution, sales and purchases before an individual consumer quenches his or her thirst with a sixteen ounce bottle of Snapple. Although Plaintiffs allege that "rather than enforc[ing] its own transshipping policy, Snapple Beverage Group embarked on a price war with SDI," Snapple Beverage Corporation, Cadbury Schweppes, and SDI (or its predecessor Mr. Natural) instituted anti-transshipping policies and have employed and maintained remedial measures, through which they receive reports of transshipped items and impose fines on the sources of transshipped items (apparently regardless of any finding of fault in the matter). *See e.g., DX-13 - DX-18.* Nevertheless, Plaintiffs allege that Defendants promoted or caused transshipping by selling Snapple products to alleged transshippers at reduced prices.

Plaintiffs' proofs as to actual injury resulting from the alleged discriminatory pricing as opposed to other potentially impacting factors, appears inadequate to show that the injury did not result from other factors. While Plaintiffs blame this omission on Defendants' filing of a responsive rather than an affirmative expert report, the Court cannot overlook the blatant omission by Plaintiffs' experts to account for or to control for any factors other than Defendants' alleged conduct in calculating Plaintiffs' injury. Plaintiffs' opposing argument that their expert report "by its very nature shows that the injury to its business was not caused by factors unrelated to the Defendants' price discrimination" is unavailing. *Oppos. Memo at 47.* As is apparent by virtue of common sense and basic market knowledge, and as is addressed in Defendants' expert report, there exist numerous additional factors that could have, and likely did have a meaningful effect upon sales of Plaintiffs' products in the relevant time frame. Among

the factors are that retailers such as pizzerias and Mom and Pop shops are likely to desire conveniences such as "one stop shopping" for a variety of brands of products. As the Court noted in *Intimate Bookshop, Inc. v. Barnes & Noble, Inc.*, 2003 U.S. Dist. LEXIS 17231 (S. D.N.Y. 2003), "though a plaintiff need not enumerate all possible sources of its loss, it must make some showing that the injury to its business was not caused by factors unrelated to the defendant's price discrimination." Plaintiffs' omission of any such consideration for purposes of proving causation renders the expert's conclusions inadequate to defeat summary judgment. As is understood in the beverage manufacturing and distribution industry, transshipping is a problematic interference with the contractual agreements between parties such as those involved in this action, and does not in itself provide support for an antitrust action.

*B. Actual Injury*

Defendants argue, and this Court agrees, that Plaintiffs cannot establish the requisite competitive nexus that promotions given to Cott Essex in 2002 resulted in transshipping. Plaintiffs contend that the price differential between Plaintiffs and alleged transshippers Beverages Unlimited, Cott Essex, Jetro, and M & T Pretzel, provide a reasonable basis on which to conclude that competition has been harmed. Defendants also claim there is no proof of injury because the few transshippers who purchased from SDI did so at prices above the average net price for Plaintiffs. Plaintiffs contend that the appropriate standard for proving "injury to competition" is by analysis of an "actual price differential (or cost), which is vastly different than an 'average net price' differential." *Oppos. at 36.* Defendants argue that Plaintiffs have no evidence of actual injury because they haven't identified or shown which alleged losses were

caused by Defendants' alleged price discrimination and which were caused by other factors such

as marketplace trends, for example, the changes in consumer trends from drinking tea to water,

etc.  Indeed, Plaintiffs' own expert used average net prices for purposes of analysis, and

Defendants were understandably taken aback when Plaintiffs argued in opposition that the

average net prices is a "fallacious standard." *Opposition at 35.*

> The Supreme Court has held:

> Before an injured party can recover damages under the Act, he must, of course, be able to show a causal connection between the price discrimination in violation of the Act and the injury suffered. ... If there is sufficient evidence in the record to support an inference of causation, the ultimate conclusion as to what that evidence proves is for the jury.

*Perkins v. Standard Oil Co.*, 395 U.S. 642, 648 (U.S. 1969).

> The Supreme Court later explained:

> By its terms § 2 (a) is a prophylactic statute which is violated merely upon a showing that "the effect of such discrimination may be substantially to lessen competition." (Emphasis supplied.) As our cases have recognized, the statute does not "require that the discriminations must in fact have harmed competition." *Corn Products Refining Co. v. FTC*, 324 U.S. 726, 742 (1945); *FTC v. Morton Salt Co., supra*, at 46 ("the statute does not require the Commission to find that injury has actually resulted"). Section 4 of the Clayton Act, in contrast, is essentially a remedial statute. It provides treble damages to "[any] person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . ." (Emphasis supplied.) To recover treble damages, then, a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent. *Perkins v. Standard Oil Co.*, 395 U.S. 642, 648 (1969) (plaintiff "must, of course, be able to show a causal connection between the price discrimination in violation of the Act and the injury suffered"). It must prove more than a violation of § 2 (a), since such proof establishes only that injury may result.

*J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 561-562 (U.S. 1981). "[P]roof of a

violation does not mean that a disfavored purchaser has been actually 'injured' within the

meaning of § 4." *Id. at 562.*  Our Court of Appeals has held:

> While competitive injury is not an element of a prima facie violation of § 2(c), a private litigant seeking treble damages for such a violation under § 4 of the Clayton Act must nevertheless allege an antitrust injury. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 335, 109 L. Ed. 2d 333, 110 S. Ct. 1884 (1990) (rejecting argument that proof of a per se violation obviated requirement that private litigant prove antitrust injury). Antitrust injury and competitive injury are conceptually distinct...[S]ee *also J. Truett Payne*, 451 U.S. 557 at 561-62, 68 L. Ed. 2d 442 (explaining some distinctions between § 2(a)'s competitive injury requirement and § 4's antitrust injury requirement); *In Town Hotels Ltd. P'ship*, 246 F. Supp. 2d at 474-81 (S.D. W. Va. 2003) (discussing distinction between types of injury in case involving similar facts). While competitive injury concerns the potential effect certain conduct may have on "competition generally" or "on the business opportunities of a defined class of competitors," *Schwartz v. Sun Co., Inc.* (R& M), 276 F.3d 900, 904 (6th Cir. 2002), the focus of "antitrust injury" is on whether the challenged conduct has actually caused harm to the plaintiff, *J. Truett Payne*, 451 U.S. 557 at 561 at 561-62, 68 L. Ed. 2d 442.
>
> To establish antitrust injury, a private litigant must "prove . . .'injur[y] in its business or property' by reason of the violation . . . [and that] the violation was at least a material cause of the plaintiff's injury." *Bohack Corp. v. Iowa Beef Processors, Inc.*, 715 F.2d 703, 710-11 (2d Cir. 1985). In other words, a plaintiff must show (1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is the type of injury contemplated by the statute.

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc*., 369 F.3d 212, 219-220 (2d Cir. 2004)(some citations omitted).


Defendants also argue, and the Court agrees, that the earlier discussed promotions sponsored by Snapple preclude the Court's reliance on the front-line prices paid by Plaintiffs as a basis for finding discriminatory pricing.  It is undisputed that Plaintiffs regularly participate in promotions, by which they sell at a lower price, and are later reimbursed by Snapple for the price differences, such that each Plaintiff's profit margin remains the same, even amidst a sales promotion.  Accordingly, a price differential at this level does not provide a sufficient basis for

defeating summary judgment.  *See, e.g., Amsterdam Tobacco Inc. v. Philip Morris Inc*., 107 F.Supp.2d 210, *220 - 221 (S.D.N.Y. 2000)(noting that the term "price" under the Robinson-Patman Act means the net price received by the seller from the two buyers in question, and that Plaintiffs erroneously asserted that the "price" to be considered under the Robinson-Patman Act is the "amount actually paid by the purchaser").

The Court also agrees with Defendant that reliance on individual invoices would merely reveal price differences at a particular moment in time and are not reflective of the pricing realized by Plaintiffs and therefore cannot be relied upon to show that Plaintiffs experienced a "substantial price difference over time."  *See George Haug Co.,* 148 F.3d at 142  ("*Morton Salt* permits an inference of injury to competition from evidence of a substantial price difference over time, because such a price difference may harm the competitive opportunities of purchasers, and thus create a "reasonable possibility" that competition itself may be harmed."); *see also Volvo*, *supra* (each Plaintiff must determine whether he was disfavored on average as compared to a competitor over time).  The Supreme Court concluded that isolated price differentials didn't suffice with regard to high dollar items such as Volvo trucks, and this Court is constrained to conclude that the isolated price differentials of 24-bottle cases of 16 ounce beverages proffered by Plaintiffs are likewise insufficient to defeat the motion.

Defendants argue, and the Court agrees, that "to the extent that Cott Essex's customers (or their customers' customers) transshipped Snapple products into plaintiffs' territories as a result of a price differential between their purchase price and plaintiffs' selling price, defendants

are not responsible for that circumstance and did not cause injury to competition." *Memorandum at 34.* The Court disagrees with Plaintiffs' opposing argument that price discrimination "has already been established." *Oppo. Memo at 62.* As earlier noted, sales prices to master distributors and the independent contractors for one master distributor do not form a basis for price discrimination between competitors.

For the reasons set forth above, summary judgment is granted as to Plaintiffs' claims based on an antitrust violation.

## II. Breach of Contract Claims

Defendants argue that "Plaintiff's breach of contract claims fail as a matter of law, because there is no evidence that selling to alleged transshippers breached Plaintiffs' agreements, or that sales by Area Route Distributors to alleged transshippers breached Plaintiffs' agreements, or that Defendants maintained alleged "unlawful relationships" with unidentified agents, or that any alleged breach of agreements proximately caused Plaintiffs' damages.

Because the Court concludes that Defendants have made a successful motion to dismiss the federal claims before the Court, the Court declines to exercise supplemental jurisdiction over the state claims and will not comment as to their merits. Plaintiffs' claims based on New York State contract law are accordingly dismissed without prejudice.

The Clerk shall file final judgments.

X

X

X

X

X

SO ORDERED.

Dated: White Plains, New York
        September 13, 2007

_____
Charles L. Brieant, U.S.D.J.